**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LIBERTY MUTUAL FIRE INSURANCE
COMPANY, a Massachusetts Corporation,

        Plaintiff,

vs.                           CASE NO.:  8:09-CV-2144-T-33-TBM

SOUTHEASTERN MECHANICAL
SERVICES, INC., a Florida Corporation, and
SAN MIGUEL ELECTRIC COOPERATIVE,
INC., a Texas Corporation

        Defendants.        /

**LIBERTY MUTUAL FIRE INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO SAN MIGUEL ELECTRIC COOPERATIVE, INC.'S MOTION TO DISMISS**

      Liberty Mutual Fire Insurance Company ("Liberty Mutual"), pursuant to M.D. Fla. L.R. 3.01, responds in opposition to San Miguel Electric Cooperative, Inc.'s ("San Miguel") Motion to Dismiss [Doc. # 23] and requests that this Court deny San Miguel's Motion to Dismiss.  The grounds for Liberty Mutual's position is set forth in the attached Memorandum of Law in Opposition.

**MEMORANDUM OF LAW IN OPPOSITION**

      San Miguel states that Liberty Mutual's Complaint for Declaratory Relief [Doc. # 1] should be dismissed because this Court lacks personal jurisdiction over San Miguel by virtue of Florida's "long-arm" statute and the Due Process clause of the 14th Amendment.  San Miguel bases its position on the assertion of various jurisdictional facts, including (1) San Miguel is a Texas company, with its principal place of business in Texas, whose sole business activity is to produce electricity for its two Texas customers, South Texas Electric Cooperative, Inc. ("STEC") and Brazos Electric Power Cooperative, Inc. ("Brazos"); (2) San Miguel does not

carry on the business of producing electricity in the State of Florida, does not generate or sell electricity in the State of Florida, and does not advertise or solicit customers in the State of Florida; (3) San Miguel does not have a registered agent in Florida; (4) San Miguel does not own or lease real property in the State of Florida; and (5) San Miguel "occasionally solicits bids from, and contracts with, Florida companies for repair and maintenance."

Liberty Mutual does not dispute San Miguel's first four assertions, but these facts alone are not determinative of personal jurisdiction and do not provide an accurate picture of the substantial and anything but isolated contacts that San Miguel maintains with entities in the State of Florida. San Miguel fails to disclose that "occasionally solicits bids" means 100% of bids sought from Florida companies are solicited by San Miguel and that those bids and contracts with companies equate to millions of dollars each year.

During the past five years, San Miguel has contracted with companies from Florida no less than one hundred and thirty-five (135) times for repair and maintenance services. San Miguel's contracts with these Florida companies exceeds $10 million. It is undisputed that San Miguel purposefully chose to solicit and conduct business with these Florida companies by proposal packages, email correspondence and telephone calls. San Miguel does not accept unsolicited services, rather it sought out these Florida companies for repair and maintenance services. It is undisputed that San Miguel holds years-long relationships with most of these companies. As further evidenced below, San Miguel's contacts with Florida are substantial, not isolated. Therefore, San Miguel's Motion to Dismiss should be denied because this Court has general jurisdiction over San Miguel.

Moreover, for the past ten to fifteen years, San Miguel requires that the repair and maintenance companies with whom it contracts name San Miguel as an additional insured under

their respective policies of insurance.   The contract between San Miguel and Southeastern Mechanical Services, Inc. ("SMS") is no exception, as San Miguel required in its proposal package and contract that SMS name San Miguel as an additional insured under the Liberty Mutual policy at issue here.   Therefore, San Miguel's Motion to Dismiss should be denied because this Court has specific jurisdiction over San Miguel, as well.

I.      **SAN MIGUEL'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE THIS COURT HAS GENERAL JURISDICTION OVER SAN MIGUEL**

"A federal district court sitting in diversity may exercise personal jurisdiction to the extent authorized by the law of the state in which it sits and to the extent allowed under the Constitution."  *Meier ex rel. Meier v. Sun Intern. Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002) (citations omitted).   San Miguel argues that Liberty Mutual failed to establish a prima facie case of personal jurisdiction over San Miguel and relies solely on the allegations of the Complaint [Doc. #1] to assert its position.   Liberty Mutual, however, is entitled to set forth evidence, outside of the pleadings, to establish the basis for jurisdiction.  *See Blanco v. Carigulf Lines*, 632 F.2d 656, 658 (5th Cir.1980)(recognizing "the rules entitle a plaintiff to elicit material facts regarding jurisdiction through discovery before a claim may be dismissed for lack of jurisdiction."); and *Gleneagle Ship Management Co. v. Leondakos*, 602 So. 2d 1282, 1284 (Fla. 1992) (adopting federal courts' policy allowing discovery on questions of jurisdiction and citing *Silk v. Sieling*, 7 F.R.D. 576, 577 (E.D. Pa. 1947) ("There can be no doubt that this Court has the judicial power to hear and determine questions involving its jurisdiction either of the person or of the subject matter nor that, in order to resolve fact issues on which jurisdiction depends, the ordinary process of the court is available to cause evidence bearing on the fact in issue to be produced.")).

Based on the foregoing, Liberty Mutual conducted jurisdictional discovery by taking the deposition of the affiant, Mike Kezar, General Manager of San Miguel, as well as issued requests for production of documents and jurisdictional interrogatories to San Miguel and SMS, respectively.  (Deposition of Mike Kezar is attached as Exhibit A.)  The discovery obtained by Liberty Mutual clearly establishes that Florida has personal jurisdiction over San Miguel.[1]

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution."  *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).

## A.   San Miguel Is Subject To Personal Jurisdiction Under Florida's Long-Arm Statute.

San Miguel argues that it cannot be reached under Florida's long-arm statute because of various provisions under Fla. Stat. § 48.193, including the position that a "connexity" must exist between the causes of action alleged by Liberty Mutual and San Miguel's Florida activities.  San Miguel's position is untenable since San Miguel is subject to general jurisdiction.  "General jurisdiction arises from a defendant's contacts with Florida that are not directly related to the cause of action being litigated, and connexity between a defendant's activities and the cause of

---

[1] Case law supports a look back period up to seven years prior to the filing of the complaint.  "[C]ontacts are commonly assessed over a period of years prior to the plaintiff's filing of the complaint."  *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 569 (2d Cir.1996).  *See also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 411 (examining contacts over a seven-year period); *Wilson v. Belin*, 20 F.3d 644, 650-651 (5th Cir. 1994) (examining defendant's contacts with forum state over five-year period), cert. denied, 513 U.S. 930 (1994); *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 376 (5th Cir. 1987) (analyzing contacts with forum state over five-year period); *Gates Learjet Corp. v. Jensen*, 743 F.2d 1330-31 (9th Cir. 1984) (examining defendant's contacts over three-year period); and *Braman v. Mary Hitchcock Memorial Hosp.*, 631 F.2d 6, 9 (2d Cir.1980) (implying that defendant's contacts with the forum state over five-year period).

action is not required. *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000).

> Florida's long-arm statute provides the following pertinent jurisdictional mandate:
>
> A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

FLA. STAT. ANN. § 48.193(2) (Thomson Reuters 2010).

Jurisdiction is proper under this section "when the nonresident defendant actually procures business in Florida or solicits business through continued or sustained efforts . . ." *Price v. Point Marine, Inc.*, 610 So. 2d 1339, 1341 (Fla. 1st DCA 1992). "Substantial and not isolated activity" has been found to mean "continuous and systematic general business contact" with Florida. *Woods v. Nova Cos. Belize, Ltd.*, 739 So. 2d 617, 620 (Fla. 4th DCA 1999). Continuous systematic business contacts "confer general jurisdiction where a nonresident defendant' activities are extensive and pervasive, in that a significant portion of the defendant's business operations or revenue derived from established commercial relationships in the state. Such contacts have also been found where the defendant continuously solicits and procures substantial sales in Florida." *Trustees of Columbia University In City of New York v. Ocean World*, S.A., 12 So. 3d 788, 793 (Fla. 4th DCA 2009).

San Miguel is subject to the jurisdiction of this Court, because San Miguel's contacts with Florida companies have been substantial and not isolated. San Miguel has solicited business from Florida companies through continued and sustained efforts. San Miguel does not accept unsolicited price quotes. (Dep. of Mike Kezar, p. 58, lines 21-22.) In fact, San Miguel's procedure for obtaining business from Florida companies is based solely on direct solicitation of Florida companies:

Q.      In the event that you are seeking a bid from a Florida entity, how does San Miguel go about doing that?

A.      It could happen in a variety of ways. It could take place via a proposal package that might be sent out via e-mail or fax. It could take place with just a simple e-mail request for a proposal if it's a pretty simple job. It might take place with a phone call, just a phone conversation. It really is going to depend upon the complexity of the job and the history between the companies.

* * *

Q.      So solicitation of bids on behalf of San Miguel is direct from San Miguel to whichever company you intend on dealing with?

A.      Or the companies that we're soliciting proposals from, yes. But it would be direct.

(Dep. of Mike Kezar, p. 25, lines 3-12, 22-25; p. 26, line 1.)  Mr. Kezar further stated that San Miguel has established at least one relationship with a Florida company by using "a third party engineering firm to assist us in identifying appropriate companies to solicit proposals from." (Dep. of Mike Kezar, p. 75, lines 15-24.)  Thus, it is undisputed that contractual relationships begin by San Miguel's directly soliciting Florida companies.  There is nothing sporadic or haphazard about these actions.

The relationships that San Miguel has forged with Florida companies for repair and maintenance services have existed for many years.  (Dep. of Mike Kezar, p. 63, lines 3-6.)  Mr. Kezar testified that repair and maintenance services include repair work, whether done in Texas or Florida:

Q.      Can you tell me what constitutes repair and maintenance services.

A.      It could involve repair of individual parts, individual components that might be shipped off for repair, for example, a piece of pipe that might need to be relined or some other piece of equipment that would need to be repaired.

        Services could involve either services performed outside the plant, but usually services that would be performed at the plant typically during those periods of time when the plant would be taken out of service for maintenance work.

* * *

Q.      Okay. And as we discussed earlier, these parts would be within the category of repair and maintenance services that you had talked about in your affidavit?

A.      Yes. Yes.

(Dep. of Mike Kezar, p. 21, lines 21-25; p. 22, lines 1-7; p. 93, lines 3-6.)

Repair and maintenance services are no small matter with San Miguel.  In fact, more than 75% of repair and maintenance services initiated by San Miguel are of such magnitude that it necessitates a shut down of San Miguel's entire plant operations twice per year for up to five weeks or more.

Q.      And how often is the -- is the plant taken out of service?

A.      We plan outages twice every year, once in the spring and once in the fall.

Q.      And approximately how long does the outage -- or do -- does each outage last?

A.      Typically, the spring outage is between 4 and 5 weeks scheduled, and typically the fall outage will be between 3 and 5 days.

* * *

Q.      Approximately what percentage of repair and maintenance services take place during the spring and fall outages in a given calendar year?

A.      You're asking me to estimate the percentage?

Q.      Correct.

A.      Easily 75 percent.

(Dep. of Mike Kezar, p. 21, lines 21-25; p. 22, lines 1-7, 10-18, 21-25; and p. 23, line 1.)  During the spring outage alone, "[a]ll of the major components of the plant equipment are opened up and worked on . . ."  (Dep. of Mike Kezar, p. 40, lines 18-20.)  Because repair and maintenance services are the "lifeblood" of San Miguel's business operations, the fact that San Miguel's contacts with Florida companies concern repair and maintenance services is significant.

San Miguel has maintained years-long relationships through continuous and systematic general business contact with Florida companies for substantial repair and maintenance services, including Southeastern Mechanical Services, Inc. (St. Petersburg, Florida), Townley Manufacturing Company (Candler, Florida), Townley Foundry and Machine (Belleview, Florida), Townley Engineering and Manufacturing Company, Inc. (Candler, Florida), and Munters, Inc. (Ft. Myers, Florida).

### Southeastern Mechanical Services of St. Petersburg, Florida
### (16 Contracts for $3.4 Million)

"All of the contracts [with SMS] . . . involved . . . boiler-related work." (Dep. of Mike Kezar, p. 40, lines 2-5.) Just as with other Florida companies, San Miguel followed its business practice of initiating communication with SMS to request proposals. (Dep. of Mike Kezar, p. 39, lines 2-5.) Contracts[2] resulting from proposals were sent to SMS's Florida office. (Dep. of Mike Kezar, p. 48, lines 3-9.) Although Mr. Kezar acknowledged the years-long relationship with SMS [Dep. of Mike Kezar, p. 39, lines 18-24], the details of the nature and extent of its long-time relationship with San Miguel, including initiation of communication by San Miguel, as well as the magnitude of the purchase orders at issue is better described by SMS.

> SMS performed pressure part repair work, mechanical repair work, overlay work and the work incident to the fabrication and delivery of overlayed boiler tubes for San Miguel since 2001. Due to the nature of the work, communications between SMS and San Miguel before, during and after the work as performed were commonplace and typically occurred on at least a daily basis during the performance of the work, much of which was performed under the supervision and direction of San Miguel's engineering department. Much of this communication took place on site between operational level workers from SMS and San Miguel, but periodically such communications included home office assistance from SMS employees located at SMS headquarters in St. Petersburg, Florida.

---

[2] Contracts with San Miguel were memorialized by purchase orders issued by San Miguel. (Dep. of Mike Kezar, p. 46, lines 13-19.) Thus, throughout Liberty Mutual's response, the terms "contract" and "purchase order" are used synonymously.

* * *

Generally, the hundreds of communications that took place at the administrative, engineering or executive level between SMS and San Miguel since 2001 have dealt with projects at San Miguel's Christine, Texas plant and: (1) work which San Miguel would like SMS to perform at the plant; (2) work which was being performed by SMS at the plant; or (3) work which had been performed by SMS at the plant. Since much of the work performed by SMS at the plant was of a sophisticated nature (such as dual pass overlay welding to increase the corrosion resistance of boiler tubes) and was being performed under the supervision of and to the specifications issued by San Miguel's in-house engineering department, administrative and engineering level communications between San Miguel personnel at the plant and SMS personnel in Florida also occurred on a routine basis during many of the jobs performed at the plant by SMS.

* * *

A general description of the work performed by SMS under those agreements would be pressure part repair and overlay welding to increase corrosion resistance of boiler tubes within the plant's boiler. This work was performed in both St. Petersburg, Florida where many parts for the projects were fabricated by SMS, and Christine, Texas, where the fabricated parts were installed and all onsite repair, overlay and work was performed. Prior to 2007, San Miguel paid SMS in full for all work performed by SMS at San Miguel's Christine, Texas plant.

In 2007, SMS responded to a request for proposal titled "Boiler Work Specification March 10, 2007" (the "RFP") issued by San Miguel for pressure part repair work on San Miguel's Christine, Texas plant during its scheduled Spring 2007 outage period. In connection with the work requested in the RFP and additional work requested by San Miguel during the Spring 2007outage, San Miguel issued the following purchase orders to SMS in the total amount of $1,523,090.01; P.O, #120363; P.O. #121635; P.O. #121519; P.O. #121763; P.O. #121764; P.O. #121765; and P.O. #122057. In response to the RFP and the aforementioned purchase orders, SMS performed $1,358,603.00 worth of work comprised of goods and services pursuant to the following SMS invoices: 9765IN; 9876IN; 9814IN; 9815IN; 9816IN; 9817IN; 9819A; 9819IN; and 9825IN. San Miguel paid SMS a total of $28,000.00 for SMS' work performed at the Christine, Texas plant during the Spring 2007 outage. $1,330,603.00 plus interest remains due and owing SMS for its work during the Spring 2007 outage.

* * *

(SMS's Answers to Jurisdictional Interrogatories, pp. 3-6, attached as Exhibit B.)

During the period of 2004 to 2007, San Miguel initiated no less than sixteen (16)

contracts with SMS in Florida for repair and maintenance services totaling nearly $3.4 million

dollars, with an average contract price in excess of $210,000.  (San Miguel purchase orders issued to SMS are attached as Exhibit C and San Miguel's payments to SMS are attached as Exhibit D.)

### Townley Manufacturing Company, Inc. of Candler, Florida
### Townley Foundry and Machine Co., Inc. of Belleview, Florida
### Townley Engineering and Manufacturing Company, Inc. of Candler, Florida
### (109 Contracts for $1.0 Million)

During the period of 2004 to 2009, San Miguel initiated no less than one hundred nine (109) contracts with the Townley entities for repair and maintenance services totaling nearly $1.0 million dollars, with an average contract price in excess of $8,600.  (San Miguel purchase orders issued to Townley Manufacturing are attached as Exhibits E-1 and E-2.)

### Townley Manufacturing

"Townley is a company that provides valves.  They reline pipe for us, they provide different fittings predominantly for use in the facility's flu gas to desulphurization unit and wet scrubber."  (Dep. of Mike Kezar, p. 57, lines 15-18.)  Services provided by Townley take place in both Texas and Florida and all checks are sent to Candler, Florida.  (Dep. of Mike Kezar, p. 57, lines 22-25; p. 58, lines 1-7.)  Just as with SMS, price quotes prepared by Townley were at the request of San Miguel.  (Dep. of Mike Kezar, p. 58, lines 21-25; p. 59, line 1.)  Additionally, all payments made to Townley Manufacturing were for purposes of repair and maintenance services.  (Dep. of Mike Kezar, p. 95, lines 10-14.)  San Miguel payments issued to Townley Manufacturing totaled in excess of $346,000 and are attached as Exhibit F.

### Townley Foundry

Townley Foundry is "part of the Townley umbrella that we've had a long relationship with."  (Dep. of Mike Kezar, p. 93, lines 7-11.)  San Miguel orders "pump housings from them, and again, these would be slurry pumps that are used in our scrubber system."  (Dep. of Mike

Kezar, p. 92, lines 9-11, 14-15, 19-21.)   The equipment and parts purchased from Townley Foundry are also categorized under repair and maintenance services.  (Dep. of Mike Kezar, p. 92, lines 24-25; p. 93, lines 1-6.)  San Miguel payments issued to Townley Foundry totaled in excess of $378,000 and are attached as Exhibit G.

### Townley Engineering

Townley Engineering is also under the same Townley umbrella.  (Dep. of Mike Kezar, p. 96, lines 8-11.)  Townley Engineering "provide pipe or line pipe, valves, actuators, similar to what we've talked about earlier, for the plant scrubber system."  (Dep. of Mike Kezar, p. 96, lines 12-16.)  Payments made by San Miguel to Townley Engineering were solely related to repair and maintenance services.  (Dep. of Mike Kezar, p. 96, lines 17-22.)   San Miguel payments issued to Townley Engineering totaled in excess of $186,000 and are attached as Exhibit H.

### Munters Corporation of Fort Myers, Florida
### (3 Contracts in excess of $110,000)

"Munters is a company that provides parts for our scrubber, our wet scrubber at the plant. The bulk of what they provide are referred to as mist eliminators."  (Dep. of Mike Kezar, p. 68, lines 4-8.)  San Miguel has maintained a relationship with Munters for at least five years.  (Dep. of Mike Kezar, p. 71, lines 24-25; p. 72, line 1.)   San Miguel maintains the same policy regarding solicitation of business as it does with other Florida companies.  Mr. Kezar's testimony offers additional insight into the proposal process as it respects travel requirements from Florida to Texas.

Q.      Okay. Where did the contract for services take place with -- not -- but in general, when dealing with Munters, where would the contract take place?

A.      If we were ordering parts, we would follow the process we talked about earlier where we would solicit a quote, issue a purchase order, and the parts would simply be shipped by Munters to the San Miguel plant.

> This proposal appears to refer to a wash system and upgrade study, which I would believe would have required Munters to come to the plant site to actually conduct that study. So it would have involved both work performed off site and on site.

(Dep. of Mike Kezar, p. 68, lines 4-8, 18-25; p. 69, lines 1-4.)  Munters issued four proposals and performed liquid carryover testing between November 2007 and September 3, 2009.  Portions of four proposals and liquid carryover testing are attached as Exhibit I.)[3]  Each of the Munters' proposals was separately solicited by San Miguel.  (Dep. of Mike Kezar, p. 74, lines 10-13.)

During the period of 2007 to 2009, San Miguel directly solicited no less than four proposals for repair and maintenance services from Munters, which resulted in three (3) contracts in 2009 for repair and maintenance services totaling in excess of $110,000, with an average contract price in excess of $36,000.  (San Miguel purchase orders issued to Munters are attached as Exhibit J and San Miguel's payments to Munters are attached as Exhibit K.)

In addition to the foregoing, San Miguel has initiated significant contacts with other Florida entities, which has resulted in millions of dollars of contracts for repair and maintenance services.

### Southern Environmental, Inc. of Pensacola, Florida
### (1 Contract for $4.9 Million)

San Miguel's contact with Southern Environmental, Inc. ("SEI") sets forth the effort San Miguel puts into its solicitation efforts.

Q.      Is this your first dealing with Southern Environmental?

A.      To the best of my recollection, yes.

---

[3] Pursuant to the Agreed Protective Order, the pricing associated with the proposals was redacted to protect confidential information.  The portions attached are attached to establish the long-running relationship between San Miguel and Munters.

Q.     And in a circumstance like this where it's a first time, how did you go about the proposal process with Southern Environmental, as opposed to, say, Townley that you have a longstanding relationship with?

A.     As I recall, we utilized a third party engineering firm to assist us in identifying appropriate companies to solicit proposals from.

(Dep. of Mike Kezar, p. 75, lines 15-24.)

At San Miguel's request, SEI issued a proposal for a rebuild project in the amount of $4.9 million dollars, and San Miguel accepted the proposal.  (Dep. of Mike Kezar, p. 81, lines 11-18.)  (Proposal attached as Exhibit L.)  Prior to the proposal, SEI participated in two detailed inspections with an extensive punch list for each—to which items to be repaired was apportioned between San Miguel and SEI.  (Dep. of Mike Kezar, p. 77, lines 13-19.)  (Inspections are attached as Exhibit M.)

During 2009, San Miguel initiated and executed a contract with SEI in the amount of $4.9 million.  (Dep. of Mike Kezar, p. 81, lines 11-18.)

### Able Body Labor of Palm Harbor, Florida
### (1 Contract in excess of $600,000)

Able Body Labor is a company that San Miguel utilized during an outage in 2005.  (Dep. of Mike Kezar, p. 83, lines 5-8.)  During the 2005 outage, San Miguel solicited and entered into a contract with Able Body in an amount that exceeds $600,000.  (San Miguel's purchase order issued to Able Body, attached as Exhibit N, and San Miguel's payments to Able Body, attached as Exhibit O.)

**B.     San Miguel Is Subject To Personal Jurisdiction Under The Fourteenth Amendment Because Minimum Contacts Are Satisfied And The Traditional Notions Of Fair Play And Substantial Justice Are Not Offended**

San Miguel also argues that this Court's exercise of personal jurisdiction over it "would violate constitutional due process and would offend traditional notions of substantial justice and fair play."  In its argument, San Miguel focuses on this Court's lack of general jurisdiction and

repeats the same jurisdictional facts argued in its position under the Florida long-arm statute. San Miguel's argument fails for the simple reason that its contacts with Florida are substantial, as opposed to isolated. It is well-settled that the "substantial and not isolated activity" requirement of the long-arm statute is long-recognized by Florida courts as the "functional equivalent of the continuous and systematic contact requirement for general jurisdiction.

> "Substantial and not isolated activity" has been found to mean "continuous and systematic general business contact" with Florida. This "continuous and systematic" contacts standard was the standard enunciated by the Supreme Court in *Helicopteros* as sufficient to fulfill the due process requirements of minimum contacts when asserting general jurisdiction. 466 U.S. at 415, 104 S.Ct. 1868. Because section 48.193(2) requires this high threshold, if the defendant's activities meet the requirements of section 48.193(2), minimum contacts is also satisfied. *See Universal Caribbean*, 543 So.2d at 448; *Nichols*, 652 So.2d at 391; *American Overseas*, 632 So.2d at 1127-28; *see also Venetian Salami*, 554 So.2d at 502 (recognizing that some bases of jurisdiction found in section 48.193 would satisfy minimum contacts concerns).

*Woods v. Nova Cos. Belize, Ltd.*, 739 So. 2d 617, 620 (Fla. 4th DCA 1999); *see also Universal Caribbean Estab. v. Bard*, 543 So. 2d 447, 448 (Fla. 4th DCA 1989) (finding activities that satisfy §48.193(2) equates to finding that minimum contacts exist); and *Kertesz v. Net Transactions, Ltd.*, 635 F.Supp. 2d 1339 (S.D. Fla. 2009) (finding that jurisdiction under §48.193(2) merges with the Due Process clause).

Nevertheless, from the constitutional perspective, to establish general personal jurisdiction over a nonresident defendant, San Miguel's conduct in connection with Florida must be such that it should reasonably anticipate being haled into a Florida court. *See Vos, B.V. v. Payen*, 15 So. 3d 734, 736 (Fla. 3d DCA 2009) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287 (1980)). That test is easily met here based upon San Miguel's activities within Florida, in which it has clearly invoked the benefits and protections of Florida law. *See Aspsoft, Inc. v. WebClay*, 983 So. 2d 761 (Fla. 5th DCA 2008) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)).

Here, San Miguel has directly solicited Florida companies for proposals, bids and quotes, which has resulted in more than 135 contracts.[4] As part of these contracts, San Miguel agreed to make payment to the Florida company in the State of Florida.  San Miguel's agreement to make payment in Florida constituted an affirmative decision by San Miguel to create a substantial contact with the state of Florida.  *Thompson v. King*, 523 F.Supp. 180, 185 (M.D. Fla. 1981) (finding "[t]he agreement to perform the contract in Florida could not be considered a de minimis contact. It represented a major obligation on the part of defendant and created a major expectation on the part of plaintiff.").  As such, San Miguel's actions constitute purposeful availment of the privilege of conducting activities within Florida, which would invoke the benefits and protections of its laws, and constitute minimum contacts under the 14th Amendment.

**C.    San Miguel Is Subject To Personal Jurisdiction Under The Fourteenth Amendment Because The Traditional Notions Of Fair Play And Substantial Justice Are Not Offended**

The factors of whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice" are 1) the burden on the defendant in defending the lawsuit; 2) the forum state's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and, 5) the shared interest of the states in furthering fundamental substantive social policies.  *Cronin v. Washington Nat'l Ins. Co.*, 980 F.2d 663, 671 (11th Cir. 1993) (citations omitted).

Here, Florida's interest in resolving a dispute over a contract pursuant to which insurance benefits could be provided to a Florida insured is substantial.  There is no evidence that litigation

---

[4] San Miguel's physical presence is not needed to establish personal jurisdiction. *Wendt v. Horowitz*, 822 So.2d 1252, 1257-58 (Fla.2002) (finding personal jurisdiction can be established by telephonic, electronic, or written communications to Florida from an outside state).

in Florida would be more expensive or less efficient than in Texas, which is not surprising since SMS is located in Florida. Even if there was an additional burden on San Miguel, any such burden is outweighed by its pervasive systematic contacts with Florida companies. Thus, maintenance of this lawsuit within this Court does not offend traditional notions of fair play and substantial justice and personal jurisdiction over San Miguel is proper.

## II.  SAN MIGUEL'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE THIS COURT HAS SPECIFIC JURISDICTION OVER SAN MIGUEL

Florida's long-arm statute provides an additional provision by which San Miguel is subject to personal jurisdiction with this Court. Specifically, a non-resident company submits itself to the jurisdiction of this Court "for any cause of action arising from . . . (d) Contracting to insure any person, property, or risk located within this state at the time of contracting." FLA. STAT. ANN. § 48.193(1)(d) (Thomson Reuters 2010). San Miguel argues that it "did not contract to insure any person located in Florida; Liberty Mutual did." (Doc. #23, p. 8, ¶21.) San Miguel's position is a red herring.

In fact, San Miguel required SMS to name it as an additional insured under the Liberty Mutual policy issued to SMS by virtue of insurance requirements that were part of the proposal package and contract with SMS. (Dep. of Mike Kezar, p. 107, lines 6-14, 22-25; p. 108, lines 1-10, 24-25; p. 109, lines 1-2; and Letter is attached as Exhibit P.) Additionally, it has been San Miguel's course of business for the past ten to fifteen years to utilize these requirements for all of its contracts out of the San Miguel plant. (Dep. of Mike Kezar, p. 108, lines 11-15.)

Q.      All right. If you could look at document 2476.

(Document 2476 referenced.)

A.      THE WITNESS: (Witness complies.) Okay.

* * *

Q.      Was this document part of the boiler work specification?

A.     Yes, it would have been part of the specification package that would have gone out.

Q.     And this 2476 here appears to be a generic letter to any contractor. Can I assume that the contractor in this case would be Southeastern?

A.     Yes.

Q.     And it's dated August 19, 2004?

A.     Yes.  This is a letter that goes out to all our bidders.

Q.     Okay.  Is it then made part of the contract, or is it just part of the request for proposal?

A.     Both.  It's made part of the contract.

Q.     And how long has it been San Miguel's policy to utilize this letter?

A.     A letter similar to this, for many years. I don't know when it actually got started, but I would think for at least the last 10 to 15 years.

* * *

Q.     And that was basically the standard practice, to seek to have San Miguel named as an additional insured for contracts?

A.     Yes.

Q.     Why did San Miguel want that language?

A.     That was language that was recommended by the consultant that we used for insurance purposes.

Q.     What steps did San Miguel take to ensure it was named an additional insured?

A.     I can speak generally.  Paula Harvey, who is our accounting manager, would receive a list of contractors that would be coming on the site to perform work, and she or someone on her staff, as a matter of course, would contact those contractors or whoever the San Miguel coordinator was for that contract and request insurance certificates that named San Miguel as an additional insured.

Q.     Was this a letter made a part of subsequent contracts with Southeastern?

A.     I would assume so, but I would have to look at each individual contract. If a written contract was structured, it should have been, yes.

(Dep. of Mike Kezar, p. 107, lines 1-17, 22-25; p. 108, lines 1-15, 24-25; p. 109, lines 1-5, 7-16, 18-22.)

Thus, in addition to purposefully soliciting bids from Florida companies, San Miguel requires that the repair and maintenance companies with whom it contracts name San Miguel as an additional insured under their respective policies of insurance, as it has done for the past ten to fifteen years.  San Miguel knowingly contracts with Florida companies and requires the Florida companies to name San Miguel as an additional insured—knowing these policies of insurance were likely issued and delivered in Florida.  The contract between San Miguel and SMS is no exception, as San Miguel required in its proposal package and contract that SMS name San Miguel as an additional insured under the Liberty Mutual policy at issue here.[5]

San Miguel seeks to avoid this Court's personal jurisdiction by arguing that the Liberty Mutual policy was an insurance contract between SMS and Liberty Mutual.  In actuality, San Miguel mandated SMS provide it with the benefits of an additional insured under the Liberty Mutual policy—a policy of insurance that San Miguel knew would be issued and delivered Florida.  The fact that SMS purchased the policy does not change the fact that San Miguel purposefully availed itself of the benefits of the Liberty Mutual policy through its contract with SMS.[6]  Therefore, San Miguel's Motion to Dismiss should be denied because this Court has specific jurisdiction over San Miguel.

Just as under the argument for general jurisdiction, Florida's interest in resolving a dispute over a contract pursuant to which insurance benefits could be provided to a Florida insured is substantial.  There is no evidence that litigation in Florida would be more expensive or

---

[5] San Miguel's reliance on *Chicago Ins. Co. v. Lammers*, 2006 U.S. Dist. LEXIS 97079 (M.D. Fla. October 31, 2006) is contrary to the facts.  In *Lammers*, unlike here, the parties seeking dismissal had no contacts with Florida nor did the injured parties in *Lammers* attempt to be named as additional insureds under the Chicago policy.

[6] Liberty Mutual has offered to defend SMS, subject to a reservation of rights, but SMS has neither accepted nor rejected the defense, as the parties are negotiating the terms of the defense.

less efficient than in Texas.  Thus, maintenance of this lawsuit within this Court does not offend

traditional notions of fair play and substantial justice and personal jurisdiction over San Miguel

is proper.

## II.   CONCLUSION

For the reasons detailed above, Liberty Mutual Fire Insurance Company respectfully

requests this Court deny San Miguel Electric Cooperative, Inc.'s Motion to Dismiss.

Respectfully submitted,

s/Edward T. Sylvester
Ronald L. Kammer
Florida Bar No. 360589
rkammer@hinshawlaw.com
Edward Sylvester
Florida Bar No. 0051612
esylvester@hinshawlaw.com
HINSHAW & CULBERTSON LLP
9155 S. Dadeland Boulevard, Suite 1600
Miami, Florida 33156-2741
Telephone: 305-358-7747
Facsimile: 305-577-1063
*Attorneys for Plaintiff Liberty Mutual Fire
Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: M. Diane Vogt, Esq., Law Office of M. Diane Vogt, P.A., 500 East Kennedy Boulevard, Suite 100, Tampa, Florida 33602, and Cheryl L. Worman, Esq., Rogers Tower, P.A., Rogers Towers, P.A., 1301 Riverplace Blvd., Suite 1500, Jacksonville, Florida  32207.

s/Edward T. Sylvester
Ronald L. Kammer
Florida Bar No. 360589
rkammer@hinshawlaw.com
Edward Sylvester
Florida Bar No. 0051612
esylvester@hinshawlaw.com
HINSHAW & CULBERTSON LLP
9155 S. Dadeland Boulevard, Suite 1600
Miami, Florida 33156-2741
Telephone: 305-358-7747
Facsimile: 305-577-1063
*Attorneys for Plaintiff Liberty Mutual Fire Insurance Company*